950 So.2d 750 (2006)
Edna J. HUGGINS
v.
GERRY LANE ENTERPRISES, INC. and ABC Insurance Company.
No. 2005 CA 2665.
Court of Appeal of Louisiana, First Circuit.
November 3, 2006.
Writ Granted February 2, 2007.
*751 Kirk A. Williams, Vincent J. DeSalvo, Baton Rouge, for Plaintiff/Appellant Edna J. Huggins.
Thomas D. Fazio, McCollister, McCleary & Fazio, Baton Rouge, for Defendants/Third-Party Plaintiffs/Appellants Gerry Lane Enterprises, Inc. and Louisiana Insurance Guaranty Assoc.
W. Shelby McKenzie, C. Michael Hart, Taylor, Porter, Brooks & Phillips L.L.P., Baton Rouge, for Third-Party Defendant/Appellee RLI Insurance Company.
Before: PARRO, GUIDRY, and McCLENDON, JJ.
PARRO, J.
Edna J. Huggins, Gerry Lane Enterprises, Inc. (Gerry Lane), and the Louisiana Insurance Guaranty Association (LIGA) appeal a judgment that granted a motion for summary judgment in favor of RLI Insurance Company (RLI) and dismissed their claims against it for injuries suffered by Huggins in an accident on the Gerry Lane premises, on the grounds that coverage under the RLI commercial umbrella liability policy did not drop down to replace underlying scheduled liability coverage formerly provided by Reliance Insurance Company (Reliance), which is now insolvent. For the following reasons, we affirm the judgment.

BACKGROUND
Huggins filed suit against Gerry Lane and its unnamed insurer for injuries she sustained in a fall on the premises of a Gerry Lane auto dealership in September 1999. At the time of her accident, Gerry *752 Lane had coverage for such an occurrence under a $1 million liability insurance policy issued to it by Reliance; it also had a $10 million commercial umbrella liability policy from RLI to provide excess coverage. In October 2001, Reliance was declared insolvent, and an answer to Huggins' petition was filed by Gerry Lane and LIGA.[1] Gerry Lane and LIGA then filed a third-party demand against RLI. They alleged the RLI coverage dropped down to replace coverage for Huggins' claim that would have been provided by Reliance, and to provide primary coverage ahead of the coverage that was statutorily required from LIGA for the insolvent insurer. Huggins then amended her petition to add RLI and LIGA as named defendants.
RLI answered the petition and filed a motion for summary judgment on the main and third-party demands, claiming coverage under its umbrella policy did not drop down and replace the underlying coverage of the Reliance policy. In the alternative, RLI asked for a summary judgment declaring that the only circumstance under which its policy would cover this occurrence would be if Huggins' damages exceeded $1 million, in which case RLI would be liable only for the excess over that amount. Gerry Lane and LIGA opposed the motion and filed a cross-motion for summary judgment on these issues.
A certified copy of the RLI policy was submitted in connection with these motions.[2] Under "Limits of Liability," the policy stated:
A. Regardless . . . we shall only be liable for the ultimate net loss in excess of:
1. the applicable limits of scheduled underlying insurance stated in Item 5. of the Declarations, for occurrences covered by scheduled underlying insurance, plus the limits of any unscheduled underlying insurance which also provides coverage for such occurrences; or
2. the unscheduled underlying insurance or the retained limit, whichever is greater, for occurrences covered by unscheduled underlying insurance and by this policy only; or
3. the retained limit, for occurrences covered by this policy only;
but only up to the amount of our limits of liability as stated in Item 3. of the Declarations, because of any single occurrence.
Item 5 of the Declarations referred to an endorsement entitled "Schedule of Underlying Insurance," which listed a $1 million liability policy issued by Reliance.
Another section of the RLI policy, "Financial Impairment," addressed situations in which recovery from the underlying insurance provider is diminished or unavailable. That provision stated:
Bankruptcy, rehabilitation, receivership, liquidation or other financial impairment of the insured or any underlying insurer shall neither relieve nor increase any of our obligations under this policy.
In the event there is diminished recovery or no recovery available to the insured as a result of such financial impairment of any insurer providing *753 scheduled underlying insurance or unscheduled underlying insurance, the coverage under this policy shall apply only in excess of the limits of liability stated in the scheduled underlying insurance or unscheduled underlying insurance. Under no circumstances shall we be required to drop down and replace the limits of liability of a financially impaired insurer. Nor shall we assume any other obligations of a financially impaired insurer.
At the hearing on the motion, Huggins stipulated that her damages did not exceed $1 million. Based on the policy provisions, the court granted RLI's motion, dismissing all claims against it, and denied the cross-motion filed by Gerry Lane and LIGA. Huggins, Gerry Lane, and LIGA have appealed.

APPLICABLE LAW
Summary Judgment
An appellate court reviews a district court's decision to grant a motion for summary judgment de novo, using the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 750. Summary judgment shall be rendered if there is no genuine issue as to material fact and the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B). A summary judgment may be rendered on the issue of insurance coverage alone, although there is a genuine issue as to liability or damages. See LSA-C.C.P. art. 966(E); Bilbo for Basnaw v. Shelter Ins. Co., 96-1476 (La.App. 1st Cir.7/30/97), 698 So.2d 691, 694, writ denied, 97-2198 (La.11/21/97), 703 So.2d 1312. Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Reynolds v. Select Properties, Ltd., 93-1480 (La.4/11/94), 634 So.2d 1180, 1183. When the issue before the court on the motion for summary judgment is one on which the party bringing the motion will bear the burden of proof at trial, the burden of showing there is no genuine issue of material fact remains with the party bringing the motion. See LSA-C.C.P. art. 966(C)(2); Buck's Run Enterprises, Inc. v. Mapp Const., Inc., 99-3054 (La.App. 1st Cir.2/16/01), 808 So.2d 428, 431. An insurer seeking to avoid coverage through summary judgment must prove some provision applies to preclude coverage. See Gaylord Chem. Corp. v. ProPump, Inc., 98-2367 (La.App. 1st Cir.2/18/00), 753 So.2d 349, 352.
Insurance Policy Interpretation
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. Smith v. Matthews, 611 So.2d 1377, 1379 (La.1993). The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. LSA-C.C. art.2045; Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co., 93-0911 (La.1/14/94), 630 So.2d 759, 763. If the language in an insurance contract is clear and explicit, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046 The court should not strain to find ambiguity where none exists. Strickland v. State Farm Ins. Cos., 607 So.2d 769, 772 (La.App. 1st Cir.1992).
However, if there is ambiguity in an insurance policy, it must be resolved by construing the policy as a whole; one policy provision is not to be construed separately *754 at the expense of disregarding other policy provisions. See LSA-C.C. art. 2050; Louisiana Ins. Guar. Ass'n, 630 So.2d at 763. Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. Breland v. Schilling, 550 So.2d 609, 610-11 (La.1989). If, after applying the other general rules of construction, an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of coverage for the insured. See LSA-C.C. art. 2056; Louisiana Ins. Guar. Ass'n, 630 So.2d at 764. The determination of whether a contract is clear or ambiguous is a question of law. McMath Const. Co., Inc. v. Dupuy, 03-1413 (La. App. 1st Cir.11/17/04), 897 So.2d 677, 681, writ denied, 04-3085 (La.2/18/05), 896 So.2d 40.
Drop Down Coverage
Drop down coverage occurs when an insurance carrier of a higher level of coverage is obligated to provide the coverage that the carrier of the immediately underlying level of coverage has agreed to provide. Louisiana Ins. Guar. Ass'n, 630 So.2d at 760 n. 1. There are several Louisiana Supreme Court cases examining whether coverage under an umbrella policy drops down to take the place of coverage that would have been provided by an insolvent primary insurer. Ultimately, the resolution of this issue depends on the policy language in the excess policy. Id. at 762.
In two cases decided the same day, Kelly v. Weil, 563 So.2d 221 (La.1990), and Robichaux v. Randolph, 563 So.2d 226 (La. 1990), the supreme court examined situations in which the relevant provisions of the umbrella policies were virtually identical. The court used the Kelly case to summarize the law on this issue. In doing so, it identified three basic types of excess policies, depending on the policy language. The first category consists of "policies that distinctly facilitate dropping down" if the underlying insurer is insolvent. Such policies state that the limit of the excess coverage is dependent on the "collectibility" or "recoverability" of the primary limits. Because the insolvency of the underlying carrier prevents the primary limits from being collectible or recoverable, coverage does drop down and is provided by the umbrella excess policy. See Kelly, 563 So.2d at 222. A second category consists of policies in which the language is properly understood not to facilitate a drop down of the excess insurance. In these policies, excess coverage is not dependent on recoverability or collectibility of the underlying scheduled policy amounts, but on whether the risk is "covered" under an underlying policy. The court pointed out that the term "covered" does not convey the same meaning as "collectible," but rather "refers to policies owned by the insured that include the risk in question regardless of those policies' collectibility." Id. at 225. Therefore, policies in this category clearly do not provide for a drop down if there is another policy providing coverage for the occurrence. Id. at 222. The third category consists of policies in which the insured's "retained limit" is defined as the greater of the "applicable limits of the scheduled underlying policies, and the applicable limits of any other insurance collectible by the insured." Id. The umbrella policy at issue in the Kelly case used such language. The court reviewed other cases interpreting such provisions, compared this provision to other sections of the umbrella policy, and concluded that the words "collectible by the insured" in the second clause applied only to "other insurance" and not to "scheduled underlying policies." Id. at 223. Therefore, under the policy at *755 issue in Kelly, coverage provided by the umbrella policy would not drop down upon the event of the insolvency of the underlying scheduled insurer, and the only damages that could be imposed on the umbrella insurer were those in excess of the stated policy limits of the scheduled underlying policy. Id. at 226.
The Robichaux case addressed the same issue and reached the same conclusion concerning another umbrella policy falling within the third category of cases described in Kelly. Robichaux, 563 So.2d at 228. Regarding the policy at issue in Robichaux, the supreme court took particular notice of an additional provision providing specifically for the event of insolvency of the underlying insurer. That provision stated that in the event there was no recovery available to the insured as a result of the bankruptcy or insolvency of the underlying insurer, the coverage under the umbrella policy would apply only in excess of the applicable limit of liability specified in the underlying policy or policies. The court commented that this provision made the result in Robichaux "even more compelling than in Kelly," because:
It is evident that the parties to this insurance policy intended and, indeed specifically provided, that [the umbrella coverage] would not drop down in the event of the underlying insurer's insolvency.
Id. at 227-28.
The supreme court revisited the issue in Louisiana Ins. Guar. Ass'n, 630 So.2d 759 (the LIGA case). The court began its analysis by trying to fit the excess policy in that case into the appropriate Kelly category, using the limits of liability section, since these provisions define the scope of coverage. Id. at 762. However, the language of that section did not fit neatly into any of the Kelly categories, so the court examined the policy using the basic precepts of contractual interpretation, as set out in the Louisiana Civil Code and applicable jurisprudence. Id. at 762-63. The policy clearly stated in many of its provisions that it provided "excess" coverage only, and thus fell within the general rule that policies clearly stating they are excess are not required to provide drop down coverage. Id. at 769. The exception to that rule exists only when the policy language creates a "genuine ambiguity" as to the scope of coverage, such as clauses indicating coverage will be provided over underlying "collectible" or "recoverable" insurance, as in the first category of Kelly cases. Id. at 770. The court indicated its conclusions were buttressed by jurisprudence holding that:
[A]bsent a specific requirement or undertaking in the excess policy to step down in the event of the primary insurer's insolvency, an excess insurer's coverage should not be construed as stepping down.
Id. at 772.
The supreme court ultimately found in the LIGA case that although the dispositive language of the policy at issue was not the plainest, the policy unambiguously precluded drop down coverage. Id. at 772. It reached this conclusion despite "the conspicuous absence in the policy of any provision addressing the problem created by the primary insurer's . . . insolvency." Id. at 764. The court noted that until recently, "the problem created by an insolvent primary insurer was rarely addressed in the policy," in which case the argument could be made that the failure to include such a provision created an ambiguity that could serve as the basis for finding drop down coverage. Id. at 768. In a footnote, the court observed that current policies now often expressly include anti drop down provisions declaring that excess coverage will not be triggered because of the *756 primary insurer's insolvency, and as a result, one commentator has suggested that "the issue may become moot." Id. at 768 n. 18. The court also noted that some courts have described policies containing anti drop down provisions like those in the Robichaux case as a fourth category, in addition to the three Kelly categories. Id. at 762 n. 4.

ANALYSIS
The argument made by the appellants in this case is that, in addition to the precepts outlined in the above-described trio of supreme court cases, this court should be guided by a decision from the second circuit,[3]Freeman v. Philan, 37,684, 37,685 & 37,687 (La.App. 2nd Cir.10/9/03), 859 So.2d 821, writs denied, 03-3098, 03-3213 & 03-3385 (La.2/6/04), 865 So.2d 723, 728 & 735, which is directly on point. There the court examined a virtually identical RLI policy in a situation involving the insolvency of the underlying scheduled insurer, Reliance, and concluded the RLI policy provided coverage for the plaintiff's damages. The Freeman court stated:
Under the language of the RLI policy, RLI would be responsible for the loss in excess of the retained limit. The retained limit . . . is zero. Therefore, under . . . the limits of liability section for the RLI policy, RLI would be responsible for the ultimate net loss in excess of zero, which would cover the claim of [the plaintiff].
Id. at 824. The court also said that in order to avoid drop down coverage, "RLI could have listed the retained limit as the amount of the underlying insurance carrier[,] as did the insurer in Kelly. . . ." Id. Referring to the Kelly categories, the court said:
In the third category, the supreme court [in Kelly] held that whether the excess policy drops down depends upon the definition of "retained limit" and whether or not the "retained limit" creates any ambiguity in the contract of insurance. Because the retained limit in this case is clearly "0," it is clear that the RLI policy is not a true excess carrier, but that it has posited itself as a primary obligor on a claim against Reliance.
Id. Looking at the "Limits of Liability" provisions of the RLI policy, the court found that subpart (A)(1) was clearly applicable, because the accident was covered by the underlying scheduled insurance policy issued by Reliance, that subpart (A)(2) was inapplicable, and that subpart (A)(3) was "directly applicable because RLI's liability begins when its retained limit is exhausted. Here that limit is $0, so coverage begins at dollar one." Id. at 825. The court found that the policy language was "not sufficiently limited to create mutually exclusive categories of coverage," and further explained that:
[T]he Financial Impairment exclusion provision of the RLI policy does not apply in this case because liability attaches at the retained limit of zero and is not contingent on the insolvency of the underlying carrier.
Id. Therefore, the court concluded, the policy was not a true excess policy, and in fact, provided primary coverage for the plaintiff's damages. Id.
Having examined the RLI policy, the codal articles governing its interpretation, and the applicable jurisprudence, we *757 are forced to disagree with the second circuit's conclusion regarding the RLI policy. We conclude that the RLI policy falls squarely within the second category described in the Kelly case. The policy language is properly understood not to facilitate a drop down of the excess insurance, because there was scheduled underlying insurance providing coverage for the occurrence, as described in subpart (A)(1), and only that provision is applicable. Therefore, RLI could only be liable for the ultimate net loss in excess of the Reliance policy's applicable limits of $1 million. There is no specific requirement or undertaking in the RLI policy to drop down in the event of the primary insurer's insolvency, so RLI's coverage should not be construed as dropping down. Rather, as discussed in the Robichaux and LIGA cases, the "Financial Impairment" provision in the RLI policy is an anti drop down provision, which clearly expresses that the parties never intended that coverage provided by the RLI policy would drop down in the event of the insolvency of the underlying scheduled insurer.
As we see it, the initial flaw in the Freeman case is that the court ignored a basic tenet of grammatical construction, and as a result, reached a conclusion contrary to the clear wording of the RLI policy. The three subparts of the "Limits of Liability" section of the policy are separated by the word "or." The word "or" is defined as "[a] disjunctive particle used to express an alternative or to give a choice of one among two or more things." Black's Law Dictionary 987 (5th ed.1979) (emphasis added). This definition accords with a basic principle of Louisiana law regarding the interpretation of statutes found in LSA-R.S. 1:9, which provides:
Unless it is otherwise clearly indicated by the context, whenever the term "or" is used in the Revised Statutes, it is used in the disjunctive and does not mean "and/or."
See Moss v. State, 05-1963 (La.4/4/06), 925 So.2d 1185, 1197. Although the matter before us involves the interpretation of a contract, rather than a statute, we see no reason to abandon the correct grammatical construction of this common word on that account. In fact, the supreme court applied this rule in its interpretation of an endorsement to an insurance policy, stating:
We find that interpreting the endorsement in [the manner adopted by the lower court] misinterprets the word "or" between the two provisions as though "or" meant "and." The word "or" is a clear, unambiguous term and its use between the two provisions made alternative events. The two provisions are separated by the disjunctive "or," not the conjoining "and."
Blackburn v. National Union Fire Ins. Co. of Pittsburgh, 00-2668 (La.4/3/01), 784 So.2d 637, 642. The court stated that the endorsement was not ambiguous because of the use of the disjunctive "or" in the policy, and that by this use, the endorsement clearly created two distinct situations under which liability coverage would be reduced. Id. at 643.
Giving the word "or" its appropriate meaning in examining the RLI policy in this case, we note that the "Limits of Liability" section describes three distinct factual situations under which coverage would be provided and the limits of coverage under each of these situations, as follows: (1) "for occurrences covered by scheduled underlying insurance," RLI would pay the excess over the applicable limits of the scheduled policy, and any unscheduled underlying insurance that also provided coverage; or (2) "for occurrences covered by unscheduled underlying insurance and by this policy only," i.e., for occurrences not covered by scheduled underlying *758 insurance, RLI would pay the excess over the greater of the retained limit or the unscheduled underlying insurance; or (3) "for occurrences covered by this policy only," i.e., not covered by any scheduled or unscheduled underlying insurance, RLI would pay the excess over the retained limit, which is shown on the Declarations page as $0.
Contrary to the Freeman court's finding that the RLI policy language is "not sufficiently limited to create mutually exclusive categories of coverage," we find the policy is very clear and does describe alternative, mutually exclusive, factual situations. In this case, the first provision applies, because this occurrence was "covered by scheduled underlying insurance." Neither of the two alternative subparts is applicable. There was no unscheduled underlying insurance, such as special events coverage, that provided coverage for this occurrence, so the second subpart does not apply. Finally, this was not an occurrence "covered by this policy only," because the occurrence was "covered by" an underlying scheduled policy; therefore, the third subpart does not apply, and RLI does not have to pay the excess over the retained limit of $0.
The Freeman court interpreted the RLI policy as providing primary coverage under subpart 3 of its policy. That interpretation ignored the language of that subpart"for occurrences covered by this policy only"which by its use of the word "only" to modify "this policy," unambiguously provides that the circumstance under which RLI's policy would pay the excess over the retained limit of $0 would be if there were no other policies covering the occurrence. This might happen if there was a scheduled underlying policy that did not cover the particular occurrence or claim due to some policy exclusion, and no other insurance was available to cover the loss. In such a case, the occurrence would be covered by the RLI policy only, and subpart 3 would apply.
Appellants contend that when the underlying scheduled insurer became insolvent, the RLI policy became the "only" policy covering the occurrence, and for this reason also, subpart 3 was applicable. However, this argument would completely eliminate the distinction so carefully drawn by the supreme court in Kelly between a policy stating that excess coverage is dependent on "collectible" or "recoverable" underlying coverage, and a policy like RLI's, which does not use that language, but instead is dependent on "coverage" by the underlying policy.
Applying the Kelly analysis, the RLI policy fits into the category of cases in which excess coverage is not based on "collectibility" or "recovery" of underlying insurance, either scheduled or unscheduled. There are three alternative situations described in the RLI policy, and the excess coverage is clearly stated for each of those situations. Once it is found that one of those situations exists, then the limits stated as pertaining to that situation are the applicable limits, and the other situations are not considered. The situation applicable to this case is the one in which "coverage" for this type of risk or occurrence is provided by scheduled underlying insurance, and the RLI coverage is for the excess of the liability limits of that scheduled insurance. Therefore, the RLI policy language is not ambiguous and is properly understood not to facilitate a drop down of the excess insurance.[4]
*759 By mischaracterizing the RLI policy as "not a true excess policy," but one providing primary coverage for the plaintiff's damages, the Freeman decision evaded the supreme court's recognition in the Robichaux and LIGA cases of the efficacy of anti drop down provisions in excess policies. In both of those cases, the supreme court noted that such provisions provide a clear reflection of the intent of the parties that the policy was not intended to drop down and provide coverage when scheduled or unscheduled insurance covered the occurrence, but became uncollectible due to insolvency of the underlying insurance provider. The financial impairment provision of the RLI policy describes in easily understandable language the precise factual situation presented in this case, and makes it very clear that "[u]nder no circumstances shall [RLI] be required to drop down and replace the limits of liability of a financially impaired insurer." Read in pari materia with the other provisions of the RLI policy, this section expresses the intent of the parties that the RLI policy is a "true excess policy" and was not intended to drop down to provide coverage for an underlying insolvent insurer.

CONCLUSION
For the foregoing reasons, the judgment dismissing all claims against RLI Insurance Company is affirmed. All costs of this appeal, in the amount of $507.64, are assessed to Edna J. Huggins, Gerry Lane Enterprises, Inc., and the Louisiana Insurance Guaranty Association.
AFFIRMED.
NOTES
[1] All parties agree that Reliance was the underlying scheduled liability insurer for Gerry Lane on the date of Huggins' accident, that the Reliance policy limits were $1 million, and that Reliance was declared insolvent in the Commonwealth of Pennsylvania on October 3, 2001. Its insolvency triggered LIGA's statutory responsibility under LSA-R.S. 22:1382(A)(1)(a) for claims made by or against Reliance's insureds.
[2] For ease in reading the quoted portions of the policy, we have omitted the bold typeface used for words that are defined terms in the policy.
[3] Of course, while such jurisprudence may be instructive and even persuasive, this court is not bound by the decision of another appellate court. Orillion v. Allstate Ins. Co., 96-1131 (La.App. 1st Cir.2/14/97), 690 So.2d 846, 849, writ denied, 97-0664 (La.4/25/97), 692 So.2d 1092; Graves v. Businelle Towing Corp., 95-1999 (La.App. 1st Cir.4/30/96), 673 So.2d 311, 315.
[4] For a case from this court with a similar result under similar factual circumstances, but different policy language, see Bonin v. Cournoyer-Buick-Pontiac-GMC, Inc., 05-0171 (La.App. 1st Cir.12/22/05), 922 So.2d 608, writ denied, 06-0654 (La. 5/26/06), 930 So.2d 29.